HEMPTON, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 25 — June 20, 1901.*

*Criminal law and practice: Homicide: Insanity: Evidence: Verdict of sanity: Incapacity to form design to kill may be shown on plea of not guilty: Right of cross-examination: Opinions of nonexperts: Presumption as to continuance of insanity: Instructions: Degrees of guilt: Intoxication: Jury: Separation: Presumption of misconduct: Affidavits of jurors.*

1. On the trial of the issue of insanity in a prosecution for a criminal homicide, it is proper to show on the part of the accused that he was adjudged insane and committed to the state hospital at a time previous to the homicide, and the facts on which the adjudication took place, and to that end to introduce in evidence the reports of the examining physicians.

2. The daily record of a patient at the hospital for the insane, required to be kept by sec. 561*q*, Stats. 1898, is admissible in evidence to show the mental characteristics of the patient while at the hospital in any judicial proceedings where the facts in that regard are material, under the general rule that a public record required to be kept for public purposes is admissible in a judicial proceeding where such matters are material.

3. Insanity is provable by circumstantial evidence mainly, all the acts and mental characteristics of the person whose sanity is in question, covering a considerable period of time prior to the particular time in question and thereafter as well, being material.

4. The verdict of the jury, on the special issue as to the sanity of a person charged with a criminal offense at the time of the alleged commission thereof, that he was sane, precludes further inquiry as to mental impairment at such time entirely excusing the accused from legal responsibility; but on the plea of not guilty, evidence is permissible tending to show a condition of mind — whether produced by the use of intoxicating liquor or any other cause — rendering the accused incapable of forming a specific intent to commit the crime of murder at the time of the alleged offense, and bearing on the character of the offense if he is guilty at all.

5. On the question of whether, because of an abnormal mental condition, the accused in a prosecution for criminal homicide was capable of forming a design to kill, a material issuable question arises involving mental condition, which may be evidenced by proof of

the use of intoxicating liquors or by any other adequate disturbing cause.

6. The right of reasonable cross-examination by leading questions is absolute. The denial of it is the denial of a valuable right, and, if prejudicial, constitutes reversible error.

7. A nonexpert witness may give opinion evidence as to the mental condition of a person if he is shown to have knowledge of facts regarding such person reasonably sufficient in the judgment of the court to enable him to form an opinion.

8. On the question of the competency of a nonexpert witness to testify under the foregoing rule, the decision of the court, if it does not transcend the bounds of reason, is conclusive.

9. Under the statutes of this state, after a person has been on parole continuously from the hospital for the insane for the period of two years or more, the adjudication upon which he was committed to the hospital is no longer *prima facie* proof of insanity.

10. The rule, independent of the statute, that a person adjudged insane continues so till the contrary is shown, is a rule of evidence, subject to reasonable change by legislative will. It does not apply to insanity other than that of a nature liable to be permanent.

11. Upon the trial of a person for murder, where the question of whether the accused caused the death of the deceased is disputed, it is error, though not necessarily reversible error, for the court to use language in instructions to the jury or in remarks upon the trial indicating that the accused took the life of the deceased.

12. While the court, in a prosecution for murder, should submit the case to the jury for consideration upon every phase of criminal homicide which the evidence in any reasonable view of it suggests, if the submission is made of one or more of the higher degrees of criminal homicide so that the jury will understand that if a verdict of guilty be not found as to one of them a verdict of not guilty should be rendered, a failure to submit lesser degrees of homicidal offense is not reversible error, though the better practice is to scrutinize the evidence with the greatest care and to resolve all reasonable doubts as to whether the evidence points to a particular degree of criminal homicide or not in favor of submitting such degree to the jury, and to submit the same whether it be requested on the part of the accused or not.

13. Evidence of voluntary intoxication of a person accused of the crime of murder has no significance as to murder in the first degree, unless the intoxication be such as to satisfy the jury that the accused, at the time of the homicide, was incapable of forming a deliberate intent to take the life of the deceased.

Hempton vs. The State.

14. The separation of the jury in a capital case is fatal to a conviction unless the court shall be satisfied, by evidence produced, that it was not followed by any misconduct on their part, or by any circumstance calculated to exert an improper influence upon the verdict.
15. From the mere fact of the separation of a jury in a capital case contrary to the rule above indicated, a presumption of prejudice of the accused arises, and such presumption cannot be satisfactorily overcome by the affidavits of the jurors themselves and the officers sworn to attend them that they were not prejudicially affected by the separation or by anything that occurred during the time of such separation.
16. The conduct of jurors while outside of the court room, impeaching their verdict, may be shown by their own affidavits.

[Syllabus by MARSHALL, J.]

ERROR to review a judgment of the circuit court for Manitowoc county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

The plaintiff in error was convicted of the crime of murder in the first degree. On July 27, 1898, about 5 o'clock p. m., Elizabeth Hempton, the wife of plaintiff in error, was shot through the head and instantly killed in the home occupied by him. For some time before such occurrence the deceased and her husband had not lived happily together. She commenced a suit against him for divorce, which was discontinued, and the parties resumed living together. About one year thereafter, and shortly before the alleged homicide, she again left her husband and commenced an action for divorce. At the time of the occurrence in question *Hempton* was engaged in the business of draying and maintained a home, his sister being his housekeeper. At such time, while *Hempton* was away at his work, his wife visited his home and took therefrom some things which she claimed were hers. About noon of the same day she made a second visit to the house and took away some things, *Hempton* being at home on such occasion. He then told his wife to come the next day for the balance of her things. During the afternoon, in his absence, she made several visits to the house.

*Hempton* returned home between 4 and 5 o'clock p. m. and directed his daughter, a girl then about ten years of age, to go to a neighbor's near by to request her mother, who was there, to come to his house. The girl did as directed, and Mrs. Hempton promptly complied with the invitation. While the girl was gone upon such errand *Hempton* walked the floor of the kitchen. When Mrs. Hempton arrived the two went into the front room of the house, there being a sitting room between such room and the kitchen. The sister remained in the kitchen. The little girl was outside the house. Angry words were soon heard to pass between *Hempton* and his wife. She stamped her foot and gave the lie to her husband, when immediately a revolver was discharged twice in the room. Almost immediately thereafter *Hempton* returned to the kitchen with a revolver in his hands. The little girl saw her mother in the front room soon after the first shot was fired, lying on the floor apparently unconscious, and saw her father turn the revolver upon himself and discharge it.

Soon after such occurrence officers of the law visited the house, where they found the dead body of Mrs. Hempton on a chair in the kitchen, also found some bedclothes and a pillow covered with blood in the front room, and a revolver, stained with blood, lying on the bureau in the bedroom, two of the chambers thereof being empty. They arrested the plaintiff in error. He had a wound on the right temple and one back of and a little above the ear on that side of his head, both apparently caused by a bullet fired from behind. A bullet entered Mrs. Hempton's head on the right side just in front of and above the ear, passed through the skull, and lodged in the scalp directly above the ear on the left side of the head. The side of her head where the bullet entered was powder burned.

The day after the alleged homicide *Hempton* said that he thought he would scare his wife and that he guessed he

scared her more than he intended.  He was placed on trial on the charge of murder in the first degree.  The theory of the state was that he deliberately shot his wife and then turned the revolver upon himself and inflicted the wounds on his head that have been mentioned.  The theory of the defense was that *Hempton* was insane and irresponsible at the time of the alleged homicide, that the shooting of his wife was accidental, or that, if he did the deed and was criminally responsible therefor, he was guilty of some offense less than murder in the first degree because of his mind being in such a condition from partial insanity, or from drunkenness, or from uncontrollable passion at the time of the occurrence, that there was no premeditated design on his part to kill his wife.  There was a special plea of insanity and a plea of not guilty.

The verdicts upon both issues were against the accused, he being found guilty of the highest offense of criminal homicide.  Sentence was passed accordingly.  Exceptions were taken to rulings of the court during the progress of and subsequent to the trial, which are considered in the opinion.

*G. G. Sedgwick*, for the plaintiff in error, argued, among other things, that in criminal cases, and especially in capital felonies, where members of the jury are permitted to read editorial comments unfavorable to the accused, a new trial ought always to be granted.  *People v. McCoy*, 71 Cal. 395; *Carter v. State*, 9 Lea, 440; *Walker v. State*, 37 Tex. 366; *People v. Stokes*, 103 Cal. 193; *Farrer v. State*, 2 Ohio St. 54; *Mattox v. U. S.* 146 U. S. 140; *State v. Walton*, 92 Iowa, 455; *Cartwright v. State*, 71 Miss. 82; 17 Am. & Eng. Ency. of Law (2d ed.), 1248, subd. 1.  If the jury separate in a capital case, there must be a new trial unless it be shown affirmatively by the state that no harm results.  Thompson, Trials, § 2549; *Keenan v. State*, 8 Wis. 132; *Rowan v. State*, 30 Wis. 129; *State v. Dolling*, 37 Wis. 396.  The use of in-

Hempton vs. The State.

toxicating drinks by the jurymen and by the officers in charge was misconduct warranting a new trial. *Roman v. State*, 41 Wis. 316; *Jones v. State*, 13 Tex. 168, 179; *Brown v. State*, 137 Ind. 240; *State v. Baldy*, 17 Iowa, 39; *People v. Douglass*, 4 Cow. 26–36. Where drinking is attended with other acts of misconduct, as the separation of the jury, the verdict will the more readily be set aside. *Creek v. State*, 24 Ind. 151; *Davis v. State*, 35 Ind. 496–499; *State v. Prescott*, 7 N. H. 289; *Jackson v. Jackson*, 40 Ga. 150; Thompson, Trials, § 2567; *Studley v. Hall*, 22 Me. 198.

For the defendant in error there was a brief by the *Attorney General*, and oral argument by *R. F. Hamilton*, second assistant attorney general. They contended, *inter alia*, that a verdict should not be set aside for the misconduct of the jurors in drinking intoxicating liquors, where there is no reason to suspect that it influenced the verdict. *Roman v. State*, 41 Wis. 312; *Clifford v. State*, 58 Wis. 477; *Grottkau v. State*, 70 Wis. 462; *State v. Jones*, 7 Nev. 408; *Tuttle v. State*, 6 Tex. App. 556; *State v. Livingston*, 64 Iowa, 560; *People v. Van Horn*, 119 Cal. 323; *People v. Leary*, 105 Cal. 486; *People v. Sansome*, 98 Cal. 235. See, further, *State v. Cucuel*, 31 N. J. Law, 249; 12 Ency. of Pl. & Pr. 607; *Rowe v. State*, 11 Humph. 491; *Browning v. State*, 33 Miss. 48; *Doyal v. State*, 70 Ga. 134; *State v. Fairlamb*, 121 Mo. 137; *State v. Hunter*, 18 Wash. 670; *Jones v. People*, 6 Colo. 452.

MARSHALL, J. Many propositions are presented for consideration in the brief of counsel for plaintiff in error, some of which are not considered of sufficient consequence to call for special mention in this opinion, though each, it is believed, has been considered with all the care which in any view of the case the same requires in order to do justice to the accused.

Evidence was given on the special issue to the effect that tho accused was duly adjudged insane in January, 1884, and

committed to the Northern Hospital for such unfortunates, and that he was discharged therefrom in March, 1885. Proof was also made that in September, 1885, he was again duly adjudged insane, and was thereupon committed as before, and that in December, 1885, he was again discharged on parole. On the trial of such issue the reports of the examining physicians in the judicial proceedings which resulted in the commitments mentioned, and the daily record of the accused while he was at the hospital, kept in accordance with the statute (sec. 561g, Stats. 1898), were offered in evidence generally, and were excluded so far as they showed the mental characteristics of the accused at the times referred to therein, or anything other than the facts as regards his having been twice adjudged insane, committed accordingly, and discharged as before indicated. The adjudications were not conclusive in favor of the accused except that he was insane when they were made, but the nature of his insanity at that time was proper to be shown in connection with all the circumstances of his life indicating his mental characteristics. The adjudications, without the grounds upon which they were made, so far as explaining the condition of the accused long after the presumption of insanity arising therefrom ceased, were of little value. The records kept at the hospital, by a rule of evidence too familiar to require discussion, were competent evidence of the facts which they purported to show. All public records which are by law required to be kept for the purpose of preserving evidence of transactions and occurrences for public uses, are competent to establish such transactions or occurrences when they are material in a judicial proceeding. *O'Mally v. McGinn*, 53 Wis. 353; *Jackson v. Astor*, 1 Pin. 137; *Thornton v. Campton*, 18 N. H. 20; 1 Greenl. Ev. § 483; Jones, Ev. § 520; Stephen, Ev. art. 34. In *Townsend v. Pepperell*, 99 Mass. 40, the record of the condition and treatment of a patient at a public hospital for the insane, produced as evidence of

Hempton vs. The State.

the facts therein referred to, was held admissible on the issue of insanity when the same was produced forty years after it was made.    That the facts referred to in the records under consideration were proper, there can be no question.    Insanity is rarely susceptible of proof by direct evidence.    Circumstances and acts of the subject, extending over a considerable period of time, are generally considered material.    It is by such means almost invariably that insanity is established.    2 Greenl. Ev. § 371.    Whether the exclusion of the evidence was sufficiently prejudicial, in view of other evidence in the case, to work a reversal, we need not decide, as there are other questions to be hereafter considered that are decisive of the case.

Evidence was offered, on the issue raised by the plea of not guilty, as to the mental characteristics of the accused, for the purpose of showing that he was afflicted with a disordered mind, not amounting to insanity in the legal sense, but of such a character as to be entitled to consideration on the question of the degree of the offense of criminal homicide of which he was guilty, if guilty of any.    The court ruled that the verdict on the special issue was conclusive as to every phase of insanity, and that no evidence of the mental condition of the accused at the time of or before the commission of the alleged offense was admissible except that which existed at the time of the offense, caused by intoxicating liquor.    No doubt the statute permitting the special plea of insanity to be interposed with the plea of not guilty, and the trial of the issue upon the special plea to take place first, and requiring the jury, in deciding it, to render a verdict of not guilty if satisfied that the accused was insane, in the legal sense, at the time of the commission of the alleged offense, or they entertain a reasonable doubt on the question, contemplates an entire separation of that subject from the issue raised by the plea of not guilty, and that the trial and final disposition of the special issue by

the verdict shall preclude any further inquiry in respect thereto.   But that goes only to the question of legal insanity excusing the accused from all responsibility for his acts; not to that lesser degree of disordered intellect rendering a person incapable of forming a design to kill, and bearing on the grade of his criminality.   The learned trial court erred in ruling that no abnormal mental condition was material upon the general issue of not guilty, other than that produced and existing at the time of the alleged homicide by the use of intoxicating liquor.   The same rule that permits proof of intoxication as bearing on the question of malice, permits evidence of a disordered mental condition, however produced.   The important circumstance is the disordered intellect, not the means by which it was produced.   *Andersen v. State*, 43 Conn. 514; *Hopt v. People*, 104 U. S. 631; *Terrill v. State*, 74 Wis. 278.   In *Terrill v. State* this court passed upon this very question, saying, in effect, that drunkenness, together with other causes affecting the mind, is proper for the consideration of the jury in determining the grade of the offense in a prosecution for murder.   The rule was stated by quoting with approval from the opinion of Mr. Justice GRAY in *Hopt v. People, supra*, thus:

"When a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question whether the accused is in such a condition of mind, by reason of drunkenness *or otherwise*, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury."

Ella Hempton, who at the time of the trial was about eleven years of age, the daughter of the accused, was one of the two persons who were near the scene of the alleged homicide at the time of its occurrence.   She was one of the principal witnesses upon whom the prosecution relied to establish the guilt of the accused.   She testified to seeing her father standing by the coal stove in the sitting room, to ob-

serving him there take something from his pocket, to there-
after observing him and her mother in the front room, the
mother being in the corner of the room on the floor and ap-
parently unconscious, to immediately thereafter seeing her
father in the kitchen with a revolver in his hand, and seeing
him turn it upon himself and discharge it. Her evidence
was very damaging to the defense. When counsel for the
accused attempted to cross-examine the girl, he was denied
the usual privilege of propounding leading questions. In
fact, the right of cross-examination of the witness was in
effect denied to the accused. Upon what theory the court
ruled in that regard we are unable to understand. We must
assume that the learned trial judge knew that the accused
had the absolute right to have every witness who testified
against him subjected to the ordinary test of cross-examina-
tion in the usual way, so long as that right was not abused,
and that the right to ask leading questions on cross-exami-
nation, as a general rule, is just as absolute as the right of
cross-examination itself. The proceedings upon the trial at
this point seem to have been highly prejudicial to the ac-
cused. When his counsel attempted to cross-examine the
girl in a proper manner, the court said: "Why can't you
ask what did she say? What is the reason you have got to
put leading questions to that child as you would to a wit-
ness of thirty-five or forty years?" "You will not be per-
mitted to do it any more. You will have to question her
about as the state did. You didn't want them to lead her
and I won't let you lead her." To that counsel for the ac-
cused very courteously and properly replied, "I only want
to lead her so as to get at the facts." That was followed
by the court's saying: "You can get the facts by asking
what she heard and what she saw." "If you can't you will
have to get along without leading questions." "This child
is only eleven, and if the state cannot lead her you cannot
lead her." Counsel replied: "We are not to take what a

Hempton vs. The State.

child eleven years old says any more than if she was forty.
We have a right to know on what she bases — " At that
point the court broke in with the exclamation: " You can't
put suggestive questions to her. She is his child and you
cannot put suggestive questions to her." Counsel further
firmly but courteously insisted upon his right to cross-exam-
ine the witness in the ordinary way, excepting to the rul-
ings of the court, and saying that they, and the manner in
which they were made, were prejudicial to the accused, that
counsel had given no occasion therefor, and was only dis-
posed to proceed fairly to elucidate the truth, whereupon
the court said: " The court has ruled that you cannot ask
leading questions of this child of eleven years of age, and
whatever you get by way of examination you must get by
putting questions to her about the same as you required the
state to do." There is more of the same sort. We will not
further quote from the record in regard thereto. Enough
has been presented to show that the rights of the accused,
at an important stage of the trial, were so violated that we
must conclude that, for such error alone, he did not have a
fair trial. No doubt a trial court has some discretionary
power to restrict the putting of leading questions to a wit-
ness on cross-examination, but it by no means goes to the
extent of justifying an arbitrary denial of the ordinary
privileges of cross-examination upon the mere ground of the
youth of the witness.

Exception was taken to the competency of several non-
expert witnesses called by the state on the special issue, to
give opinion evidence as to the mental condition of the ac-
cused. Evidence of that kind is admissible when based on
facts within the knowledge of the witness. Proof of such
facts to the satisfaction of the trial court, so long as he rules
within reason, is conclusive on the question of competency.
Wharton, Cr. Ev. § 357. We are unable to discover any good
ground for holding that the court transcended the bounds

of reason in the rulings under consideration. Each of the witnesses gave evidence showing some familiarity with the life, habits, and peculiarities of the accused, and upon that the court passed judgment on the question of competency.

The court instructed the jury on the special issue, in effect, that after the expiration of two years from the discharge of a patient from a hospital for the insane, without his having been recalled, the presumption of insanity as to such person, because of the adjudication upon which he was committed to the hospital, ceases, and that he is presumed to be sane; and that such rule applied to the accused. A law to that effect was passed in 1897 (ch. 319, Laws of 1897). It was prospective in its terms, so did not apply to the accused, who was then on parole. By ch. 327, Laws of 1899, passed after the alleged homicide, the act of 1897 was amended so as to affect all persons on parole, whether paroled prior to the passage thereof or thereafter. Counsel for plaintiff in error insists that he was entitled to the benefit of the presumption of insanity in his favor existing at the time of the alleged homicide. We are not familiar with any authority to sustain that proposition. The doctrine, once insane always insane till the contrary is established by evidence, is not and never was an absolute rule. It never applied to occasional or intermittent insanity, which was evidently the malady with which the accused was suffering on the two occasions when he was committed for treatment to the hospital for the insane. It is only where the insanity is once proven to exist and to have been of the character likely to be permanent that the rule contended for properly applies. *State v. Wilner*, 40 Wis. 304. Further, at most it is a mere rule of evidence, and as such subject to reasonable changes by the legislative will.

The court several times, in the course of his instructions to the jury upon both issues, spoke of the accused as if he were unquestionably the cause of the homicide; that he

killed his wife. Exceptions were taken thereto. We are
not prepared to say on the record that prejudicial error was
thereby committed, but it seems that the question of the
cause of the death was at issue and that the court should
have as carefully avoided expressing any opinion on that
question as on any other at issue in the case which the jury
were to decide. In a criminal case the accused is entitled
to have every issue of fact passed upon by the jury. He has
a right to stand upon that and put the prosecution to the
proof upon every essential of the offense of which he stands
charged, and to have his discharge upon the evidence by
order of the court, or the issues of fact submitted to the
jury on the evidence, without any suggestion from the bench
as to where the truth lies. The better practice is to strictly
regard that right at every step in the trial of such an im-
portant case as this, and not to take any chances of a con-
viction having to be sustained by invoking the doctrine that
only prejudicial error can disturb it.

Exceptions were taken to the refusal of the trial court to
so submit the case to the jury as to permit them to find a
verdict of manslaughter in the first or fourth degree. It is
unquestionably the duty of the trial court to submit to the
jury in a case of this kind, by proper instructions, every
phase of criminal homicide to which the evidence, in any
reasonable view of it, applies. Failure so to do is not neces-
sarily prejudicial and reversible error. It has often been
held that where the jury are instructed, in effect, that the ac-
cused is guilty of some one of the higher degrees of criminal
homicide, or not guilty, if error is thereby committed in that
the evidence would admit of a conviction of some lesser
degree of homicidal offense than the degree or degrees sub-
mitted, the error is favorable rather than unfavorable to the
accused. *Dickerson v. State,* 48 Wis. 288; *Winn v. State,* 82
Wis. 571; *Fertig v. State,* 100 Wis. 301. However, it does
not seem necessary to invoke that rule here, but we will say

Hempton vs. The State.

in passing that it is the better practice to always so try a case that there will be no necessity for invoking it,— to scrutinize the evidence with the greatest care, view it in the most favorable light it will reasonably admit of from the standpoint of the accused, and, whether requested or not, to submit to the jury every phase of criminal homicide to which it can be said reasonably to apply. We assume that the learned trial judge endeavored to do that and decided that there was nothing but mere conjecture upon which to base a verdict of manslaughter in either the first or fourth degree. We are unable to say that he was wrong, with sufficient clearness to condemn the rulings under consideration. The evidence is undisputed that the accused and his wife were in the room together when the alleged homicide occurred, and that no one else was present; that he had a revolver in his hand just before the shooting and was seen with it in his hand immediately thereafter; that no noise was made in the room prior to the shooting except that caused by the conversation of *Hempton* and his wife; that some angry words were spoken by the woman, which were immediately followed by the report of a revolver. The place where the bullet entered the woman's head and the direction it took were such as to rather repel the theory of accidental shooting. The conduct of the accused immediately after the shooting was not consistent with such theory. The revolver was held so near the woman's head that it was discolored by the powder. The theory of accidental shooting seems to require conjecture that the accused pointed the pistol at his wife's head, holding it very near thereto, and that the weapon was, while in that position, accidentally discharged. There is no evidence, seemingly, to reasonably sustain any such theory; so we cannot say the trial court erred in so deciding and that the evidence did not point to any reasonable theory of accidental shooting. There was no suggestion of accident in the evidence, except that the

accused, soon after his arrest, stated that he tried to scare his wife and that he guessed he scared her too much. *State v. Hammond,* 35 Wis. 315, *Pliemling v. State,* 46 Wis. 516, and *Terrill v. State,* 74 Wis. 278, are authority to the proposition that there must be some evidence pointing with some reasonable degree of definiteness to guilt in a particular degree to justify submission of a case to the jury upon the theory that verdict of guilty in such a degree is proper. It would seem that no authority to that proposition is necessary.

On the subject of the significance to be given to the evidence that the accused was intoxicated at the time of the homicide, the jury were instructed:

"If you find from the evidence that he fired the shot which killed his wife, and if when he did so he was in such a condition from the use of spirituous liquors that he was not capable of forming a premeditated intent to kill her, then you should consider the question of intoxication and you cannot convict him of murder in the first degree. But if he was able to form that intent to kill, wilfully, deliberately, and premeditatedly, when he fired the shot, then you must have nothing more to do with the question of his drinking and you should give it no further thought or consideration in the case, for then it cuts no further figure."

He further charged the jury that drunkenness was no excuse for crime and could not reduce the degree of a homicidal offense below that of murder in the first degree, if, notwithstanding the condition of drunkenness, the wrongdoer was capable of forming a deliberate intent to commit the homicide. Counsel for plaintiff in error confidently insists that such instructions were wrong. They are substantially in accord with the decisions of this court and the prevailing rule on the subject. In *Bernhardt v. State,* 82 Wis. 23, the following instruction was approved as a strictly accurate statement of the law:

"If you shall find from the evidence in the case that this defendant, at the time he struck the blow, was in such a condition from the use of spirituous liquors that he was inca-

pable of forming an intent to kill, then you may consider the
question of intoxication.   The question simply is, in short,
Was he at the time in such a condition mentally as to be in-
capable of forming this premeditated design to effect the
death?"  .

The court remarked: "This instruction was direct, clear,
and to the point, and the jury could understand it.   The
point is, Was he so intoxicated that he could not form the
intent or the premeditated design to kill?"   The same rule
is laid down in *Cross v. State*, 55 Wis. 261, and *Terrill v. State*,
74 Wis. 278.   In *People v. Rogers*, 18 N. Y. 9, cited by this
court in *Bernhardt v. State, supra*, there is a very full dis-
cussion by two justices of the significance to be given, in a
prosecution for murder, to evidence of intoxication of the
accused at the time of the homicide.   Mr. Justice HARRIS
said: "It has never yet been held that the crime of murder
can be reduced to manslaughter by showing that the perpe-
trator was drunk, when the same offense, if committed by
a sober man, would be murder;" that to have that effect
the defendant must be "so far deprived of his senses as to
be incapable of entertaining a purpose or acting from de-.
sign."   Courts have been very slow to break down the old
common-law doctrine as regards the effect of voluntary intox-
ication of a person at the time of the commission of a crim-
inal offense by him.   Formerly it was held to aggravate
rather than to mitigate the offense.   Now, if from passion,
stimulated by intoxication, or from any other cause, a per-
son, for the moment, is unable to exercise his reason, and
while he is in such condition, though conscious of what he
is doing and not so completely bereft of reason as to be le-
gally irresponsible, he is uncontrollably moved thereby to
and does wrongfully kill another, he cannot be convicted
of murder in the first degree.   *Clifford v. State*, 58 Wis. 477.
It is the condition, no matter how caused, overpowering
and controlling reason, which reduces the offense to some
lesser degree of criminal homicide.  If reason, notwithstand-

Hempton vs. The State.

ing the intoxication or other disturbing cause, be not so
completely dethroned, so to speak, but that the wrongdoer
can exercise judgment, he must do so or pay the penalty of
being held responsible for his acts regardless of such dis-
turbing cause.

After the close of the trial counsel for plaintiff in error
moved the court to set aside the verdict on the special issue
as well as the one on the issue of not guilty, and grant a new
trial because of mismanagement and misconduct of the jury.
Such motion was supported by affidavits of jurors, of clerks
and boarders at the hotel where the jurors took their meals
and lodged during the trial, and of other persons, to the
effect that the proceedings of the trial were from day to
day published in newspapers with comments unfavorable to
the accused, which the jurors were freely permitted to read;
that among such comments was one made after the verdict
on the special issue and before the commencement of the
trial on the issue of not guilty, commendatory of the jury
for having defeated a "lawyer's trick" to clear a murderer;
that the jurors took their meals and spent their evening and
morning hours and lodged at a hotel; that while there they
were permitted to go about the hotel office, into the bar-
room and other public places of the building, and to mingle
and talk with the people the same as other guests; that they
divided into parties in the evening, some playing cards for
drinks in the hotel barroom, one of the officers and one or
more outsiders associating with them, while others were in
the hotel office mingling with the people; that they ordered
and partook of intoxicating liquor at the end of each game
of cards, and went singly and in parties to the hotel bar
and drank liquor without restraint and without care to
avoid associating with outsiders; that they lodged at night in
four rooms which did not communicate with each other nor
with the room occupied by the officers who were charged
with attending them; that they retired at night and got up

in the morning singly and in parties with perfect freedom, and went to their morning meal singly or together at their pleasure; in fact, that they conducted themselves at the hotel the same as other persons, talking with outsiders and permitting outsiders to talk with them; that they had ample opportunity to so talk about the case and to hear conversations between outsiders in respect thereto, and to become fully conscious of public opinion in respect to the trial and the guilt of the accused; that part of the jurymen visited a barber shop in company with an officer, and there sent for and drank intoxicating liquor; that the sheriff, who was not sworn to take charge of the jury, took them out for a ride and that they stopped at a wayside saloon and partook of liquor; that such sheriff and one of the officers sworn to take charge of the jury took them to a baseball game, where there were some manifestations by people present well calculated to be interpreted by the jury as approval of their verdict on the special issue, which had theretofore been rendered; that after the decision upon the special issue jurors talked with persons at the hotel in respect to having to stay to hear the case through; that the jurors mingled with the people at and in the vicinity of the court house at times when the court was not in session, and that, generally, they were not kept together when outside the court room so as to interfere with their free communication with the people and free indulgence in intoxicating liquor.

In opposition to the motion, affidavits of jurors were presented, to the effect that they neither talked with any one nor allowed any one to talk with them about the case during the progress of the trial, nor heard anything said which affected their verdict except what they heard in the presence of the court; that they partook of intoxicating liquor in small quantities, but not so as to affect them; that they did not partake of intoxicating liquor at all while deliberating upon the case; that they read the newspapers but

were not affected thereby; that they were not out of the sight of the officer or officers in charge of them during the trial; that there were occasional separations, but that in each case an officer was in attendance upon the juror or jurors who left their fellows, and an officer was also in attendance upon those who remained. The officers who attended the jury testified to the same effect. The court denied the motion upon the ground that, while the conduct of the jurors was not what it should have been, upon all the proofs presented, excluding affidavits of the jurors presented in support of the motion, and from his personal knowledge of the jurors, it affirmatively and satisfactorily appeared to him that no improper influence reached the jury and that nothing was done by them of an improper character which prejudiced the accused.

It appears that the court, in deciding the motion as above indicated, did not consider the affidavits of the jurors presented to impeach their verdict, but remarked that he was unable to see, in such rejected affidavits, anything that would call for a different conclusion from that reached. It is a well-settled principle of law that affidavits of jurors cannot be used to impeach their verdict, but that rule applies only to affidavits concerning their conduct in court or when deliberating upon the case. Their conduct outside the court room may be established by their own affidavits for the purpose of impeaching their verdict. *McBean v. State*, 83 Wis. 206; *Peppercorn v. Black River Falls*, 89 Wis. 38; *Manix v. Malony*, 7 Iowa, 81; *Hefferon v. Gallupe*, 55 Me. 563; *Harris v. State*, 24 Neb. 803; *Rush v. St. Paul City R. Co.* 70 Minn. 5; *Mattox v. U. S.* 146 U. S. 140; 2 Thomp. Trials, § 2619. It follows that, in determining whether there was error in deciding the motion, the affidavits of the jurors as to their conduct outside the court room must be considered with all the other proofs bearing on the question.

Hempton vs. The State.

If it can be said that such gross misconduct on the part of a jury as took place upon the trial of this case can be passed over as not prejudicial to the accused, upon the mere affidavits of the guilty members of the jury and their associate guilty officers, mostly to the effect that the jury were not prejudiced by such misconduct, the constitutional right to a trial by jury with substantially the common-law safeguards to prevent a miscarriage of justice, must be considered as having been effectually laid aside. True, the courts have gone a great way in sustaining verdicts, even in capital cases, notwithstanding misconduct of the jury, upon a satisfactory affirmative showing that their impartiality and the result of their labors were not affected thereby. But we venture to say that no case can be found, certainly none that has the approval of this court, which approaches the one before us. There seems to be a growing tendency to looseness in the management of juries in important cases, which calls loudly for a check if not for a substantial reform, if judicial administration is to be kept above suspicion as regards weighing out justice with the highest attainable degree of certainty. At common law, in the trial of capital cases, the jury were required to be kept together from the time they were charged with the case till they were discharged by order of the court, and to be kept secluded from all outside influences of every nature calculated to interfere with their impartiality. They were not allowed to mingle and converse with the people, or have opportunity for reading newspaper or other accounts of the trial or be influenced by public opinion for or against the accused, or to indulge in the use of intoxicating liquor. The constitution, in preserving the right of trial by jury, preserved it with its ancient safeguards, and any infraction thereof of a nature calculated to substantially impair the right cannot properly receive the sanction of the court.

In most cases of the importance of the one before us,

where misconduct of the jury was held not to constitute reversible error, there was but one or a few trifling transgressions which happened by mere thoughtlessness and which were shown with a high degree of certainty not to have affected the minds of the jurors one way or the other in the case. In *Keenan v. State,* 8 Wis. 132, there were two transgressions, one juror being permitted to go to his home and remain all night, and one to go to the depot on business. There being no affirmative proof that such separations worked no harm to the defendant, a new trial was granted. The court laid down the rule, which has since been consistently followed, that where the jury has been permitted to separate in a capital case " unless it appears that the separation of the jurors was not followed by improper conduct on their part, nor by any circumstance calculated to exert an improper influence on the verdict, the verdict should be set aside in case of a conviction." In *State v. Dolling,* 37 Wis. 396, the court permitted the jury to separate at meal times. The defendant was convicted of manslaughter in the third degree. On the motion to set aside the verdict upon the ground that the jury were allowed to separate during the trial, affidavits of all of them and of the officers who attended them were read, to the effect that during the separations nothing improper occurred, that they followed the directions of the court and neither talked with any one about the case nor allowed any one to talk with them, that they did not hear the case discussed during such times, and that nothing occurred during the separations which could or did prejudice them in the case. The question was certified to this court, whether a new trial should be granted under such circumstances. In deciding the case it was said, in effect, that the court was not inclined to give much effect to the exception to the general rule that jurors should not be permitted to separate in a capital case; that when jurors are allowed to transgress the rule requiring them to be kept to-

gether in such a case, they are liable to be subjected to such an infinite variety of improper influences and to become unconsciously biased thereby, that the only safe way is not to permit them to separate at all; that a juror is likely to be unconsciously guilty and to conscientiously deny his guilt, so that in the very nature of things the affidavits of jurors that they were not affected in the case by anything that occurred during the time of their separation, should not be considered of itself sufficient to overcome the presumption of prejudice against the accused arising from the violation of his right to have them kept secluded from all outside influences.   The separation of the jury there under consideration, it should be remembered, was by express permission of the court under an admonition as to their conduct, and all of them testified that they strictly complied therewith, and there was no proof to the contrary.   Nevertheless, this court held that the violation of the rights of the accused was too important to be passed over as not prejudicial to him, in the absence of satisfactory proof to rebut the presumption of prejudice arising therefrom except that of the jurors themselves and the officers who attended them.   In *Roman v. State*, 41 Wis. 312, one of the jurors obtained some intoxicating liquor for himself and gave some to several of his associates.   Proof was made by the affidavits of the jurors that only a few of them knew of the liquor being obtained and that those who drank of it were not affected thereby. The court held that the rule laid down in *Keenan v. State* was satisfied, but said that the doctrine in this state is that 'if upon all the proofs presented to rebut the presumption of prejudice arising from misconduct of a jury in a capital case there remains reasonable ground to suspect that the misconduct may have influenced the verdict, the required proof is wanting and the verdict should be set aside.'

From the foregoing it will be seen that the law governing the subject under discussion is so well settled for this

state that it is needless to look elsewhere for guidance. We must hold that to allow a jury to go to a hotel, mix with the people there without restraint, play cards in public places surrounded by other persons, go singly and in groups to the hotel bar and indulge in drinking intoxicating liquor, to have the free use of newspapers, and, generally, to be in and about a hotel and other places singly and in groups associated with other persons, even though within sight of attending officers, to all intents and purposes violates the spirit if not the letter of the rule that they must not separate during the trial. Such rule means that the jury must be kept together so far as practicable, in a body, secluded from association with all other persons and all outside influences.

It will be readily seen from what has been said that the showing made to rebut the presumption of prejudice arising from the gross misconduct of the jury in this case was clearly insufficient to meet the rule laid down in *Keenan v. State*, 8 Wis. 132, and to warrant the conclusion reached by the trial court. It was substantially the same kind of proof that this court said was wholly insufficient in *State v. Dolling*, 37 Wis. 396, while the presumption of prejudice, required to be met and overcome by it, was very much stronger. In the *Dolling Case* there was no proof of misconduct while the jury were separated. The separation was erroneously permitted by the court. In this case the separation of the jury was wholly unknown to the court except as it should have been inferred from the fact that they were permitted to go to a hotel for meals and to be lodged there without express directions to the officers to keep them apart from all outsiders. Not only do we have here misconduct of the jury in separating, but misconduct in reading the newspapers, associating generally with the people, and in other things of an improper character that have been detailed which were well calculated to exercise an improper influ-

Hempton vs. The State.

ence upon their minds. The language of the exception to the general rule that a separation of the jury is fatal to a verdict of conviction in a capital case, is, as before indicated, limited to cases where it appears that the separation was not followed by improper conduct of the jurors or by any circumstance calculated to exercise an improper influence upon the verdict. It does not satisfy the exception for jurors to say that nothing occurred calculated to prejudice them. The court must be able to say that independently of the notions of the guilty parties, and must, before doing so, be satisfied beyond a reasonable doubt that such is the fact, keeping in mind how easily persons may be influenced by their environment without being conscious of it. The reading of the newspaper accounts and comments upon the trial was highly calculated to influence the minds of the jurors. The freedom with which they mingled with the people was well calculated to impress upon them the prevailing opinion as regards the guilt or innocence of the accused, and to give them a leaning in harmony therewith and they be wholly unconscious of it. Such conduct and the free indulgence in the use of intoxicating liquor were exceedingly inconsistent with the mental attitude which the law contemplates shall be maintained in dealing with the very life, as it were, of the person on trial, and interests of society of the highest moment as well. The practice of taking juries to a public hotel in such cases cannot be looked upon with favor. It is almost impossible to make officers and jurors so understand and appreciate their duties in a capital case that the jury can safely be permitted to have such liberties. The only really safe way to keep them free from all outside influences is to keep them together according to the spirit as well as the letter of the rule on the subject, to keep them absolutely free from all opportunity of mixing with outsiders, or from knowing the state of public opinion of the case, as expressed in the newspapers or otherwise. To do

that entails some hardships on the jurors, it is true, but no juror who fully appreciates the gravity of his situation in such a case and is fully worthy to enjoy the blessing of citizenship will complain.   On the contrary, it is believed the more carefully a jury of such men are guarded from outside influence, the more respect they have for the law and the more oblivious they become, for the time being, to matters of mere personal comfort, and the more willing they are to forego such matters, to the end that their final result may be above all suspicion of having been influenced by anything but the evidence and the law given in court.   Experience shows that a jury may be guarded to the very extreme here indicated without subjecting them to any discomfort prejudicial to health, and with their enthusiastic approbation and endeavor to second the efforts of the court to administer justice on the highest attainable plane of impartiality and certainty.

In deciding this case we have not taken into consideration the probability or improbability of the guilt of the plaintiff in error.   Regardless of where the truth lies on that question, he is entitled to his day in court with all the safeguards for his protection guaranteed by the law.   It is not improbable but that, in some cases, an accused person is so universally believed to be guilty in advance of his trial as to cause the trial court to unconsciously relax the care which should be exercised in all such cases.   In truth, if greater care should be exercised in one case than in another, it should be in the one where, in advance of the trial, in the public mind, there is no reasonable doubt of guilt.   As the certainty of guilt increases there should be increase rather than relaxation of care to conform to all the requisites necessary to a legal conviction, to the end that justice may not miscarry.

*By the Court.*— The judgment of the circuit court for Manitowoc county is reversed, and the cause is remanded to

such court for a new trial, for which purpose the warden of the state prison is directed to deliver the plaintiff in error, *James L. Hempton*, to the sheriff of such county, who is directed to safely keep the said *Hempton* in said custody until discharged therefrom or otherwise ordered according to law.