NEWBERN, Plaintiff in error, vs. THE STATE, Defendant in error.

*March 8, 1935—September 15, 1936.*

For the plaintiff in error there were briefs by *Willis E. Donley* of Menomonie, and *Eugene A. Rerat* and *Neil Hughes* of Minneapolis, Minnesota, attorneys, and *Walter J. Welch* of Minneapolis, Minnesota, of counsel, and oral argument by *Mr. Donley* and *Mr. Hughes.*

For the defendant in error there was a brief by the *Attorney General, Cornelius P. Hanley,* special assistant attorney general, and *A. L. Galvin,* district attorney of Dunn county, and oral argument by *Mr. Hanley, Mr. J. E. Messerschmidt,* assistant attorney general, and *Mr. Galvin.*

The following opinion was filed April 2, 1935:

FOWLER, J. The plaintiff in error, hereinafter referred to as the defendant, claims that, (1) the evidence is insufficient to support the conviction, and that (2) he should be awarded a new trial because of statements made by a juror and in her presence during trial of the case.

(1) The defendant was convicted of robbery of a bank in Menomonie by bandits, in the course of which one employee of the bank was shot by one of the bandits and wounded. Another employee was abducted by the robbers and by them left dead with a dead bandit beside the road a few miles from the city of Menomonie. Another bandit was found dead

with a portion of the loot beside him some seventy miles from said city. One of the bandits was stationed outside the bank beside a large automobile in which the bandits made their escape, armed with a machine gun which until he was shot and killed he kept discharging to keep people away from the bank. The evidence shows conclusively that at least two bandits entered the bank, and leaves it uncertain whether three or more entered. According to the testimony of Mr. Rommelmeyer, the cashier of the bank, one of the bandits walked from the entrance to the bank across the lobby directly to his desk, drew and pointed a revolver at him, and commanded him to get back and lie down on the floor. Rommelmeyer did not comply immediately, but stood and looked at the bandit in the face. The bandit commanded him a second time to lie down, and again he did not respond immediately. The bandit then grabbed him by the arm, whirled him around, and shoved him through a door. From the bandit's entrance into the bank until he turned Rommelmeyer around, Rommelmeyer was looking at him all the time, and got another look at him while he was lying down. He did not see him thereafter during the robbery, but recognized his voice in the lobby of the bank saying: "Take your time boys—there's lots of time," and directing the bandits to "bring one of the girls" with them. Rommelmeyer described this bandit as weighing about one hundred fifty-five pounds, wearing a brown coat and brown hat, and as having peculiar eyes as his outstanding feature. He was positive in his identification of the defendant as the man who pointed the gun at him and commanded him to lie down. Rommelmeyer saw the defendant in a "show-up" with several others in a jail at Minneapolis, and recognized him immediately as the bandit he saw in the bank. He recognized him by his eyes particularly and by his general build. In the meantime he had viewed a suspect at Duluth, one at Joliet, and two at Fort Leavenworth, Kansas, none of whom he recognized. One of the two men seen by him at

Fort Leavenworth was one whom the defense claimed to have proved accosted Rommelmeyer on the robbery charged.

Miss Gullickson, an employee of the bank, testified that she saw a bandit enter the bank, walk directly to Rommelmeyer, and point a gun at him, and heard him tell Rommelmeyer to "get back and lay down." She had a clear vision and saw his face. She saw no other bandit. She identified the defendant as this bandit. She immediately recognized the defendant as this bandit in a "show-up" in Minneapolis some six months after Rommelmeyer's recognition of him there. Her identification was positive.

As weakening the force of the identifications of the defendant, the defense relies on the testimony of Mr. Austreng, a farmer and truck driver, who was talking with Rommelmeyer at the time the bandit accosted him, and Hedtlevedt, his sixteen-year-old nephew, who was with him at the time. These two were facing Rommelmeyer and had their backs to the bandit as he approached. The first either knew of the bandit's presence was when he came up behind them and "put his gun in Rommelmeyer's stomach." They got a side view of the bandit but got a good look at him. They both testified that the defendant was not this bandit, and that the bandit was two or three inches shorter than the defendant. On the trial these men were shown pictures of the men Rommelmeyer viewed at Fort Leavenworth. Austreng said one of the men resembled the bandit who accosted Rommelmeyer, but he was not sure. The boy said one of the two pictures resembled this bandit more than any other picture he was shown. This constitutes the evidence that the defense claims "proves" that the man Rommelmeyer saw at Leavenworth was the bandit who accosted him. The bandit was behind these witnesses as they went to lie down. The defendant took the stand and denied any participation in the robbery. He also testified that he was in Minneapolis at the time of

the robbery, and that he was at a service station getting his automobile serviced when a truck driver, that had driven through Menomonie the morning of the robbery after it occurred, arrived at the station and told of the robbery. This truck driver corroborated the defendant as to this, but from circumstances related by him the jury might properly have inferred that his meeting of the defendant at the service station occurred a week after the robbery when he also drove through Menomonie.

We are of opinion that the evidence stated sustains the verdict of the jury. We cannot say that they were not justified in relying on the positive identification of the defendant by Rommelmeyer and Miss Gullickson. Rommelmeyer showed himself not disposed to convict anybody, by his refusal to place the crime upon the numerous other suspects he was taken to view. The credibility of the witnesses and the weight of their testimony was for the jury. If the testimony of these two witnesses that the defendant is the man who entered the bank and accosted Rommelmeyer at the time of the robbery is true, and the jury considered it was, the defendant is guilty of the crime charged. The trial judge refused to disturb the verdict, and in view of the evidence we cannot override his approval of it.

(2) The jurors were not kept together during the trial. Two women jurors stayed at a boardinghouse kept by Mrs. Baxter where Miss Gullickson, the state's witness who identified defendant as one of the bank robbers, boarded and roomed. Miss Gullickson heard one of these jurors, Mrs. Fisher, say to the other, Mrs. Baskin, at the boardinghouse, referring to Hedtlevedt, one of the defense witnesses, the sixteen-year-old boy referred to in the statement of the evidence made in connection with (1) above: "My, that little boy certainly done fine. You can just see the truth coming from his lips." This came to the attention of the state's at-

torney, and he called it to the attention of the trial judge. The trial judge thereupon called Miss Gullickson into his chambers, questioned her in presence of the defendant and his counsel and the state's counsel. It appeared from the examination that Mrs. Fisher made the remark quoted; that remarks were made in the house by the children of Mrs. Baxter about Miss Gullickson and her testimony, and that Miss Gullickson herself had talked some at the table about the trial with the Baxter children when the jurors were present. This talk appeared to be general, not about the merits of the case, but about attendance and the like, and that the witness had said nothing herself to the jurors. The judge called in the landlady and examined her, and told her that Miss Gullickson should change her boarding place during the trial, and that she should not say anything to the jurors about the matter. The trial proceeded. The defendant's counsel did not object to its continuance.

We are of opinion that the defendant and his counsel are estopped to claim prejudice or a new trial because of the matters disclosed at Miss Gullickson's examination. They evidently considered that what had occurred was to the defendant's advantage rather than his prejudice, and preferred to take their chances with the jury rather than ask for a mistrial. They should be held to abide by their choice then made.

After the verdict was returned, the defendant's counsel were informed that Miss Gullickson and others had made other statements in the presence of the jurors, and moved for a new trial on the ground of these statements and those above referred to. The court then summoned the juror, Mrs. Fisher, the landlady, and the landlady's son, a young man of twenty-two years of.age. On this hearing it developed that the landlady's son had said at the table that the defendant was a gambler or card shark and that the juror, Mrs. Fisher, had said in substance that his hands didn't look like farmer's

hands. This statement was not prejudicial, as the defendant took the stand and it appeared from his testimony that he was and for years had been a professional gambler.

It also appeared from the examination of Mrs. Fisher, the juror, that Miss Gullickson had said that the state wanted Mr. Donley, who was counsel of the defendant, on their side. Mrs. Fisher testified that she saw Miss Gullickson when she went out of the judge's chambers after her examination there during the trial, and that she woke up in the night and thought that Miss Gullickson had told on her, and that Miss Gullickson had got her into trouble. She further testified that Mrs. Baxter, the landlady, told her that Miss Gullickson had said she went through something awful and she (Miss Gullickson) would tell her (Mrs. Baxter) about it when the case was over. Mrs. Baxter also told Mrs. Fisher what the latter had said about the Hedtlevedt boy, and that Miss Gullickson was not going to stay at the house any more. It also appeared that Mrs. Baxter and the two jurors went to a church social together during the trial, but it did not appear that anything was there said about the case in the presence of the jurors. The son of the landlady testified at the hearing before the judge, after the return of the verdict, that Miss Gullickson said at the table in the presence of the jurors that the Hedtlevedt boy was very good and brave. The landlady testified at this hearing that Mrs. Fisher, the juror, asked her about Miss Gullickson's going into the judge's office, and she told her Miss Gullickson would not tell what happened until the case was over.

Besides this testimony, affidavits were presented on the motion for a new trial. The other juror, Mrs. Baskin, in addition to corroborating some of the matters above stated, stated that she saw Miss Gullickson and Mrs. Baxter go to the judge's chambers, and she knew "that things were not normal." The Baxter girls, fifteen and twenty-five years old, gave a joint affidavit, in which they stated that when Mrs.

Fisher made the statement about the Hedtlevedt boy's testimony, Miss Gullickson said the boy had a lot of nerve to testify the way he did, and that they drew the inference from the statement that Miss Gullickson's opinion of the boy's testimony was contrary to that of Mrs. Fisher. They also stated that, when the talk was had at the table about defendant's gambling, some one said he must have lots of money. Mrs. Fisher also made an affidavit, which was presented on the motion for a new trial, in which she stated that when she made her statement about the testimony of the Hedtlevedt boy Miss Gullickson said the boy had a lot of nerve to testify as he did, and he certainly was brave, and from this she thought that Miss Gullickson meant he was not telling the truth.

The husband of the juror, Mrs. Fisher, made an affidavit, presented on the motion for a new trial, in which he stated that when his wife went to sit on the jury she was in good health every way, and that when she came home after the trial she was very nervous and almost hysterical, and when she came into the house she threw on the table the money she had received for jury service and said: "I don't want anything to do with that, it is blood money," and became hysterical and cried and cried.

All of the matters above mentioned were properly receivable on the motion for a new trial. But for the conduct of the defendant and his counsel in not asking for a mistrial upon the disclosures made upon the examination of Miss Gullickson during the trial, the court should have awarded a new trial because of them. But as the defendant and his counsel waived objection to the verdict because of the disclosures made upon the examination of Miss Gullickson during the trial, so did they, in our opinion, waive objection by reason of all the other matters disclosed on the examinations subsequent to the trial and the affidavits upon which the motion for a new trial was based. *Nelson v. State,* 186 Wis. 648,

203 N. W. 343, so indicates. Counsel say that they did not know of these other matters at the time of the examination of Miss Gullickson during the trial, and that they should not be held to have waived objection because of what they did not know. But all the statements made to or in the presence of the jurors disclosed by the subsequent examinations and the affidavits had occurred before the examination of Miss Gullickson. That examination disclosed that the three children of the landlady had talked about the case at the table in the presence of the jurors, and counsel for the defendant could have called them in for examination had they desired to do so. They preferred to let the matter rest without further investigation at the time, because they considered what had occurred would work to the defendant's advantage. After taking their chances because of one juror's indication of leaning toward the side of the defendant, they cannot be heard to object to the verdict because of matters they might then have brought to the attention of the court had they pressed the inquiry further. As to the effect upon herself of the misconduct of Mrs. Fisher in talking about the case to the other juror, and her hearing of Miss Gullickson's examination, they took their chances as to that also.

Our holding that the defendant waived the misconduct upon which he bases his motion for a new trial has the support of previous decisions of the court. In *Grottkau v. State,* 70 Wis. 462, 36 N. W. 31, it was held that a party knowing of misconduct during a trial by remaining silent during the trial waives objection to it. This rule has been since followed in *Wetzler v. Glassner,* 185 Wis. 593, 598, 201 N. W. 740, and *Schumacher v. Milwaukee,* 209 Wis. 43, 243 N. W. 756. In the similar situation of prejudicial remarks of counsel it has often been held that one cannot remain silent at the time they are made and after the verdict assert them as ground for a new trial. *Basile v. Fath,* 185 Wis. 646, 201 N. W. 247, 202 N. W. 367.

This disposes of all the matters above mentioned laid as ground for a new trial except the statement of the husband of Mrs. Fisher made immediately upon Mrs. Fisher's return from service on the case. The statement doubtless shows that Mrs. Fisher was too nervous, sentimental, and weak of will to be suitable for jury service. But verdicts cannot be set aside because a juror happens to be of unsuitable temperament. It is doubtless a defect of the jury system that unsuitable persons at times are selected for jury service. A defendant is not required in this state to submit his case to a jury. Sec. 357.01, Stats. *Jennings v. State,* 134 Wis. 307, 114 N. W. 492. When he submits his case to a jury, he takes his chances upon the suitability of its members for jury service.

Besides the matters above mentioned, the defendant urges as ground for a new trial statements contained in the affidavit of Mrs. Fisher of matters that occurred in the jury room; that she believed the defendant not guilty; that she voted guilty under fear because of Mrs. Baxter and Miss Gullickson having been called in before the judge, and under fear because of what jurors said in the jury room; that she feared she would get into trouble and voted guilty because of this fear.

The affidavit of Mrs. Fisher as to the matters above stated was not receivable and cannot be considered. "The general rule is very ancient, and often reiterated, that the statements of jurors will not be received to establish their own misconduct or to impeach their verdict. *Edmister v. Garrison,* 18 Wis. *594, *603." *Wolfgram v. Schoepke,* 123 Wis. 19, 24, 100 N. W. 1054. It is pointed out in the case last cited that some limitations of the rule exist, but the rule applies "to affidavits concerning their conduct in court or when deliberating upon the case." *Hempton v. State,* 111 Wis. 127, 145, 86 N. W. 596; *Dishmaker v. Heck,* 159 Wis. 572, 578, 150 N. W. 951; *Imperio v. State,* 153 Wis. 455, 460, 141 N. W. 241. Many cases to this effect are cited in *Woodward v.*

*Leavitt,* 107 Mass. 453, 461 *et seq.* An affidavit of Mrs. Fisher's husband was presented which contained statements made to him by Mrs. Fisher as to occurrences in the jury room, her belief in the defendant's innocence, and that she was actuated by fear in assenting to the verdict. But if the affidavits of the juror herself as to such matters may not be considered, with stronger reason the affidavit of other persons as to her unsworn statements as to such matters may not.

*By the Court.*—The judgment of the circuit court is affirmed.

The following memorandum was filed September 15, 1936:

PER CURIAM (*on motion for rehearing*). A motion for rehearing was duly filed by the defendant, but the filing of a brief in support of the motion was long delayed. No brief in opposition to the motion was filed by the attorney general, the special prosecutor appointed by the court, or the district attorney. In absence of an opposing brief, a hearing before the members of the court in chambers was invited, at which the attorney for the defendant and the special prosecutor appeared. After this hearing the district attorney was invited to file an opposing brief if he desired, and no brief has been received.

In view of this unusual situation we have carefully reconsidered the case. We perceive no error in the rules of law stated and applied in the opinion of the court heretofore filed, but are persuaded that upon the record there is such doubt of the defendant's connection with the crime involved that a new trial should be ordered in the interest of justice, and it will be so ordered. By reason of matters stated in the former opinion of the court respecting statements made to and in the presence of jurors, we consider that upon retrial of the case

the jurors should be kept in custody of an officer, as is required on trials of charges of homicide.

The mandate heretofore entered is set aside; the judgment and sentence of the circuit court is reversed; and the cause is remanded for a new trial in accordance with the opinion. The warden of the state's prison is directed to remand the defendant to the custody of the sheriff of Dunn county, to be held pursuant to the order of the committing magistrate.