STATE v. THORNE.

No. 2203. Decided May 29, 1911 (117 Pac. 58).

1. HOMICIDE — INSTRUCTIONS—"MURDER." Comp. Laws 1907, sec. 4159, defines murder as "the unlawful killing of a human being with malice aforethought." Section 4161 makes a killing committed in an attempt to perpetrate robbery, murder in the first degree. An information for murder alleged that accused "unlawfully, willfully, feloniously, deliberately, premeditatedly, and of his malice aforethought, and with the specific intent to take the life" of a person named, shot and killed him. The undisputed evidence at the trial showed that the murder was committed during an attempt to perpetrate a robbery, and the evidence of accused was to the effect that the killing was due to an unintentional discharge of his pistol. The state adduced evidence that the killing was willful and intentional, and occurred during the attempt to perpetrate a robbery. *Held*, that it was not error for the court to instruct that though the killing was done in perpetrating, or in an attempt to perpetrate a robbery, and though the information contained no allegations of the killing under such circumstance, nevertheless, the accused could, under the allegations contained in the information, be convicted of first degree murder. (Page 214.)

2. HOMICIDE—INSTRUCTIONS. Under a statute providing that one guilty of murder in the first degree shall suffer death or upon the recommendation of the jury may be imprisoned for life, in the discretion of the court, and that if no recommendation is made, the court must pronounce the death sentence, it is error to instruct that the jury have the discretion to make or withhold the recommendation without any intimation or direction from the court as to what should control them in reaching a conclusion on the matter. Hence a charge which directs the jury to consider such question the same as any other question submitted to them, and which admonishes them that the object of the law is to punish the offender and to deter others from committing similar violations, and which directs them to consider such objects together with all the facts and circumstances in evidence in reaching a conclusion, is error because of the court's undertaking to direct them as to what should control or influence the jury in reaching a conclusion. (Page 218.)    .

3. WITNESSES—IMPEACHMENT OF MEMORY—IRRELEVANT MATTERS. In a prosecution for murder, accused testified that he was not familiar with the action of the gun with which the murder was committed, and that its discharge was unintentional. *Held*, that it was proper to ask him on cross-examination where he got the gun, to show that he had possession of the gun longer than as testified to by him; but the question, "Under what circumstances did you get the gun?" being irrelevant, to the issue and not a proper test of the memory of the witness or of his credibility or the weight of his testimony unless the question sought to incriminate accused, and it was error, on his refusing to answer under claim and allowance of privilege, to further question him with reference to any crime which he committed in obtaining the gun, and compel him to state that an answer to the question would incriminate him in the commission of another crime. (Page 221.)

4. WITNESSES—CROSS-EXAMINATION OF ACCUSED. Though accused, on becoming a witness, may be cross-examined as other witnesses, and may be asked questions irrelevant and collateral to the issue to test his memory or his credibility and the weight of testimony, when the question relates to incriminating acts or calls for evidence of an incriminating character, separate and distinct from those on trial testified to by him, he may claim his privilege and decline to answer, and the court must determine whether the evidence called for may tend to incriminate the witness. (Page 224.)

5. WITNESSES—PRIVILEGE. While a witness, in order to test his credibility, may be asked if he has not been convicted of a

39 Utah—14

crime, the question whether he has committed a crime is privileged, and he may decline to answer. (Page 226.)

6. WITNESSES—IMPEACHMENT—ACCUSED IN CRIMINAL PROSECUTION. To affect his credibility, accused, testifying as a witness, may not properly be asked questions as to specific acts of a wrongful or incriminating character not amounting to commission of a crime and which are distinct from those on trial and not voluntarily testified to by the witness. (Page 226.)

7. HOMICIDE—APPEAL AND ERROR—HARMLESS ERROR. In a prosecution for murder accused admitted the killing, but alleged that it was accidentally committed while perpetrating a burglary, the object of accused being to obtain a recommendation from the jury to be sentenced to life imprisonment. On his cross-examination he declined to answer as to circumstances under which he got the gun with which the killing was committed, on the ground of privilege. *Held*, that it was prejudicial error after the claim of allowance of privilege to allow the prosecuting attorney to further inquire into his reasons for declining to answer and to compel him to state that if he did answer his answer would incriminate him in the commission of another crime; the answers thus elicited having a tendency to prejudice accused with the jury, and thus prevent them from recommending that he be sentenced to imprisonment for life. (Page 227.)

8. CRIMINAL LAW—MISCONDUCT OF JUROR—HARMLESS ERROR. While the jury in a murder case were at lunch at a hotel in charge of two officers, after the case had been finally submitted to them, one of the jurors and one of the officers went into another part of the building where the juror talked to some one over the telephone. *Held*, that as the conduct was in violation of the court's directions and was misconduct, it was not necessary for accused to show the nature of the communication or to show that he was prejudiced thereby, as prejudice will be presumed, and the burden is on the state to show what the communication was and that it was harmless. (Page 229.)

9. WITNESSES—CROSS-EXAMINATION OF ACCUSED. In a prosecution for murder, accused testified that the murder was the result of an accidental shooting while he and others were committing a robbery, and that the pistol with which he was armed and which he pointed at deceased was accidentally fired. *Held*, that it was proper cross-examination to require accused to take the gun and show how he used it on the occasion in question, but as his sole purpose in defending the suit was to secure a recommendation from the jury to make his sentence life imprisonment instead of execution, compelling accused to put on a pair of overalls, a hat and a handkerchief used as a mask on

the night of the homicide, not to illustrate or explain any material or disputed fact, but solely to show the accused's appearance as a highwayman before the jury and to show them how he looked and appeared on the night of the homicide was error.   (Page 233.)

APPEAL from District Court, Third District; *Hon. T. D. Lewis,* Judge.

Harry Thorne was convicted of murder in the first degree and he appeals.

REVERSED AND REMANDED.

*M. E. Wilson, E. A. Walton* and *James M. Denny* for appellant.

*A. R. Barnes,* Attorney-General, for the State.

STRAUP, J.

The defendant, a boy seventeen years of age, was convicted of murder in the first degree.   It is charged in the information that he "unlawfully, willfully, feloniously, deliberately, premeditatedly, of his malice aforethought, and with the specific intent to take the life of George W. Fassell, an assault did make" with a loaded revolver in his hands, "and then and there unlawfully, willfully, feloniously, deliberately, premeditatedly, of his malice aforethought, and with the specific intent to take the life" of Fassell, discharged the revolver and shot and killed him, "and so," the defendant, "in manner and form aforesaid, unlawfully, willfully, deliberately, premeditatedly, and of his malice aforethought, the said George W. Fassell did kill and murder."   The evidence, without conflict, shows that Fassell was shot and killed by the defendant while he and two others were perpetrating a robbery in Fassell's store.   The evidence is conflicting as to whether the revolver was accidently or intentionally discharged, and Fassell intentionally or unintentionally shot and killed.   On this point the principle witness for the

state, A. F. Jacobson, testified that while he and Fassell were
alone in the store the defendant and two others, Hayes and
Curley, with handkerchiefs over their faces, entered the
store. The defendant, pointing a revolver at Jacobson, com-
manded him to throw up his hands. At the same time
Hayes, one of the other robbers, pointed a gun at Fassell
and made a similar demand of him. Jacobson hesitated a
moment, when the defendant put the muzzle of the gun within
five or six inches of Jacobson's face, and, in a commanding
tone, told him "get them up there," and "get back to that
corner." Jacobson complied, the defendant keeping the gun
close to his face and crowding him back with it. Fassell,
who was covered by Hayes, "was slow about putting his hands
up; finally he got them up and then he started to back, walk-
ing backwards. Hayes did not follow him, but kept him
covered with the gun and indicated the direction he wanted
him to go." After the defendant had backed Jacobson to
the corner he whirled towards Fassell who then, with his
hands up and moving back, was about opposite him. The
defendant approached Fassell and "punched him right in the
side with the muzzle of the gun. Mr. Fassell winced like
that, still he never took his eyes off this man. He kept
looking at him, and he again punched him, and he started
to back in that corner, and then he pulled the gun away
and says 'get back,' and just held the gun about that far off"
—eight or ten inches—"and then fired," the bullet striking
him in the left side under the armpit. Fassell threw his
hands to his side, dropped to the floor, and expired in about
half an hour. At about the time of the shooting, Hayes,
who had been pointing his gun towards Fassell, turned and
pointed it towards Jacobson. After Fassell was shot and
had fallen to the floor, the defendant walked towards the
cash register. In doing so he came between Hayes and
Jacobson. Jacobson jumped into the back office near by and
ran out.

The defendant testified in his own behalf, on direct exami-
nation, that when he and Hayes and the other robber, Cur-
ley, reached the store and entered it he "held up the butcher

(Jacobson) and told him to go back, and he went back; and Hayes he had Fassell. At first he told him to put up his hands. He seemed to hesitate; and he got him up there finally, and I told the butcher to go back there. Then Hayes told Fassell to go back there too. It seems like he didn't understand the question right away; anyway he didn't move for several seconds. When he did start to move, he moved very slow and Hayes kept on telling him to move and hurry up. I got the butcher down there, and by that time Fassell was even with the counter and I told him to hurry up, 'we don't want to stay here all night.' He kind of hesitated there, and I told him several times. Then I shoved the revolver into him and it was discharged and he fell, and then I went and looked at him, and from there I went over to the cash register which Curley was supposed to go to and take the cash, and in going out I passed it and glanced in it, and it seemed like he hadn't touched it, and I took whatever there was in it and went out." He further testified that he did not pull the trigger of the gun intentionally; that he was not familiar with the action of the gun; and that he did not intend to shoot or kill Fassell, or any one. On his cross-examination he testified that he, Hayes and Curley had started out that night "to turn a trick; that at the time we started out we didn't know what we were going to do. They said they were going to hold somebody up, but who or what or where I couldn't say." He further testified that for such purpose they first went to a laundry. They found that closed and the wagons in. They then went up the street to Fassell's store situated outside the business portion of the city. They watched and reconnoitered it for an hour or more. They finally agreed upon a plan in which the defendant upon entering the store was to cover one of the men in the store, Hayes the other, and Curley to rob the cash register. In pursuance of such plan they entered the store, the defendant pointing his loaded revolver "cocked" at Jacobson and Hayes his at Fassell. When the shot was fired Curley had reached the register and had opened it, as the defendant assumed, but left without taking the money, or, at least,

without taking all of it. The defendant, in going out, passed by the register which evidently had been opened by Curley, and seeing two ten dollar gold pieces and some silver took them.

The defendant and Hayes were arrested within an hour after the offense was committed. The next morning the defendant made a voluntary and an unsolicited confession to the chief of police and other officers, and later to the sheriff of the county and other prominent citizens, in which he admitted and stated the facts substantially as testified to by him on the trial, and in each of them stated that Fassell did not move fast enough, that he told him to hurry up, and that he "put the gun against Fassell's side," or "punched," or "poked" him in the ribs with it, and that it "went off" or "exploded."

Murder is defined by our statute, Comp. Laws Utah 1907, section 4159, to be "the unlawful killing of a human being with malice aforethought." By section 4161 it is provided that "murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life—is murder in the first degree." It is thus seen that a willful, deliberate and premeditated killing is murder in the first degree, and that a murder committed in the perpetration of, or attempt to perpetrate, a robbery, is also murder in the first degree. The court, after reading to the jury the information in which it was alleged that the defendant "unlawfully, willfully, feloniously, deliberately, premeditatedly, and of his malice aforethought, and with the specific intent to take the life" of Fassell, shot and killed him, and after stating to the jury the statutes referred to defining murder and murder in the first degree, instructed them that "so far

as material in this case, for the purpose of determining the guilt or innocence of the defendant, the statute declares that every murder committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery, is murder in the first degree." The court further charged "that the essential facts constituting the offense charged are: First, that the killing occurred in Salt Lake County, State of Utah; second, that the killing was unlawful; third, that the killing was committed in the perpetration of, or attempt to perpetrate, robbery; fourth, that the person killed was George W. Fassell; fifth, that said Fassell was killed by a pistol shot by the defendant while the defendant was engaged in perpetrating, or attempting to perpetrate, a robbery at the time the said pistol shot was fired." The court also charged the jury "if you believe beyond a reasonable doubt from the evidence that the defendant Thorne, while perpetrating, or attempting to perpetrate, a robbery, shot and killed the deceased, Fassell, then the court instructs you, for the purpose of determining the guilt or innocence of this defendant, that it is immaterial whether the shot so fired by the defendant Thorne was shot intentionally or by an unintentional discharge of the pistol in the hands of said Thorne." The court further charged the jury that "in case the victim of a robbery is killed by the person or persons engaged in perpetrating, or attempting to perpetrate, the robbery, the intent or intention of the persons perpetrating, or attempting to perpetrate, the robbery need only be to perpetrate such robbery," and all persons concerned in such attempt or perpetration, or present and aiding therein "are guilty of the murder although no one of such persons had any intent to take the life of the victim, if such murder is committed in the perpetration of, or attempt to perpetrate, such robbery." It is thus seen that while in the information an "unlawful, willful, felonious, deliberate and premeditated" killing with the specific intent to take the life of the deceased is charged, the court, nevertheless, submitted the case to the jury on the theory alone of an unlawful killing in the perpetration of, or attempt to perpetrate, a robbery, and charged that, if the

deceased was killed under such circumstances, the question of whether the defendant shot him intentionally or unintentionally was immaterial. Counsel for defendant, therefore, urge that the charge, in such particulars, is not in conformity with the allegations of the information; that while a "murder"—the unlawful killing with malice aforethought—"committed in the perpetration of, or attempt to perpetrate, a robbery," is, as defined by the statute, murder in the first degree, yet, it is urged that it is not the kind of first degree murder—the willful, deliberate, malicious and premeditated killing with malice aforethought—alleged in the information.

This involves the question of whether the accused, upon allegations in the information of an unlawful, willful, deliberate and premeditated killing by shooting, may be convicted of murder in the first degree upon proof that the shooting and the unlawful killing were done, whether intentionally or unintentionally, in the perpetration of, or attempt to perpetrate, a robbery. Upon this question the authorities divide. In the case of *Rayburn v. State,* 69 Ark. 184, 63 S. W. 356, and perhaps others, the negative of the proposition is held, but we think the weight of authority is to the contrary. (Wharton on Homicide, section 119; 1 McClain's Crim. Law, section 653; *State v. Meyers,* 99 Mo. 107, 12 S. W. 516; *State v. Harmon,* 106 Mo. 653, 18 S. W. 128; *People v. Giblin,* 115 N. Y. 196, 21 N. E. 1062, 4 L. R. A. 757; *People v. Flanigan,* 174 N. Y. 357, 66 N. E. 988; *Titus v. State,* 49 N. J. Law, 36, 7 Atl. 621; *People v. Sullivan,* 173 N. Y. 122, 65 N. E. 989, 63 L. R. A. 353, 93 Am. St. Rep. 582; *State v. Johnson,* 72 Iowa, 393, 34 N. W. 177; *State v. Tyler,* 122 Iowa, 131, 97 N. W. 983; *People v. Milton,* 145 Cal. 169, 78 Pac. 549.)

The reasons for the rule are there stated, and need not be repeated. Such holdings, of course, do not mean that upon allegations in the information of an unlawful, willful, deliberate and premeditated killing by shooting, a conviction of first degree murder may be had by proof of an unlawful killing by stabbing, or drowning, or strangulation, or burn-

ing, in the perpetration of, or attempt to perpetrate, a robbery, burglary, rape, or arson. The proof of the means and manner of causing the death must in such particular correspond with the allegations in the information. So, according to the great weight of authority, though it be alleged that the shooting and killing were done unlawfully, deliberately, premeditatedly, and of malice aforethought, and though the proof shows that the unlawful killing by shooting, whether intentional or unintentional, was done in the perpetration of, or attempt to perpetrate, a robbery, yet a conviction of murder in the first degree is supported by the allegations and proof, on the theory, as illustrated by the cited cases, that the "willful and premeditated intent to commit the felony is transferred from that offense to the homicide actually committed," and "is the legal equivalent of and tantamount to" the allegations in the information of a willful, deliberate and premeditated killing by shooting.

But, for the additional reasons, we think the defendant here cannot complain of the instructions referred to. The state adduced evidence tending to show that the defendant unlawfully shot and killed the deceased, not only in the perpetration of, or attempt to perpetrate, a robbery, but also that he, in such perpetration, or attempt, willfully and intentionally shot and killed the deceased, and hence, willfully, deliberately and premeditatedly shot and murdered him as alleged. The defendant, to meet such proof, testified to a state of facts showing that he, in the perpetration of a robbery, unlawfully shot and killed the deceased, but that such shooting and killing was done unintentionally, thus testifying to a state of facts, which, under the statute, also rendered him guilty of murder in the first degree. That is, the state proved a first degree murder by proving a willful, deliberate and premeditated killing by shooting, and the defendant, to meet it, also proved a first degree murder by proving an unlawful shooting and killing of the deceased by him in the perpetration of robbery. The turpitude and consequences of the one is by the statute made as great as the other—each being first degree murder. Now, the court, instead of sub-

mitting the case to the jury on the theory of the state's. evidence, submitted it to them on the theory alone of the defendant's evidence. We do not see how he can complain of that on the ground of variance, or upon any other ground. We think no error was committed in the giving of the instructions referred to.

Complaint is also made of an instruction relating to the recommendation of the jury. We have a statute which provides that "every person guilty of murder in the first degree shall suffer death, or, upon the recommendation of the jury, may be imprisoned at hard labor in the state prison for life in the discretion of the court." If no recommendation is made by the jury the court must pronounce the death sentence upon a verdict of guilty of first degree murder. If the recommendation is made, the court may impose such a judgment, or one of life imprisonment. The court charged the jury that "under the law of this state every person guilty of murder in the first degree shall suffer death, or, upon the recommendation of the jury, may be imprisoned at hard labor in the state prison for life, at the discretion of the court. And if you should find the defendant guilty of murder in the first degree you should then consider the question of making such recommendation, and it will be your duty to consider such question in the same manner as any other question submitted to you, giving to it your careful and conscientious consideration; and should you decide to make such recommendation you will include it in your verdict. The object of the law in punishing a person guilty of crime is not vengeance. The purpose is to deter the person who has broken the law from a repetition of his act, and also to deter other persons from committing similar breaches of the law; and if in this case your verdict is guilty, then, in determining whether or not you will include such recommendation in your verdict, you should take into consideration all of the circumstances disclosed by the evidence, and all the evidence in the case, including the evidence on behalf of the defendant, and also the object and purpose of the law in imposing punishment, and it should be the result of your de-

liberate consideration." It is contended that the court erred
in directing the jury to consider and determine the question
of recommendation in the same manner as any other question.
submitted to them, in stating to them the objects and pur-
pose of the law in punishing a person guilty of crime, and
to consider them in determining the question of recommenda-
tion, and in admonishing the jury that the determination
should be the result of their deliberate consideration of all
the facts and circumstances in evidence, and the objects and
purpose of punishment as stated to them. It needs no argu-
ment to show that the court undertook to guide and direct
the jury in the determination and exercise of a discretion
which the law conferred on them in terms unlimited and
unprescribed. May the court do that? We think not. Says
Mr. Wharton in his work on Homicide (3d Ed.), section
660: "The functions of the court are best performed under
such provisions"—permitting the jury to make a recom-
mendation in respect of the punishment—"by simply giving
the terms of the statute to the jury, and informing them that
the making or withholding of the recommendation is a mat-
ter entirely within" their discretion. Mr. Justice Temple,
in the case of *People v. Kamaunu,* 110 Cal. 609, 42 Pac.
1090, said: "This discretion is given to the jury, and the
court cannot direct or advise them upon the subject further
than to inform them of their function." The court in the
case of *Cyrus v. State,* 102 Ga. 616, 29 S. E. 917, observed
that some of the language of the following charge, were it
there an open question, would be subject to serious criticism:
"If you find the defendant guilty, it is in your discretion
whether you will recommend that he be imprisoned for life.
You are not limited or circumscribed, and the law provides
no rule for guidance. If you think this is a case in which
you would be justified in recommending to life imprisonment
in the event of your finding defendant guilty, you have a
right to make such recommendation, as it is for you to say,
in the event of your finding defendant guilty, whether the
facts and circumstances in this case warrant you in making
such recommendation. It is all a question for you under the

law and the evidence." Said the court: "It would in such cases be decidedly better to omit the use of the word 'justify' and of the word 'warrant,' and to substitute in their stead language leaving the jury free to dispose of the question of recommending or not recommending life imprisonment, without any intimation from the bench as to what should control or influence them in reaching a conclusion upon this matter."

From the charge here given, would the jury understand that their right or power to make the recommendation, or the exercise of their discretion in making or withholding it, was unlimited and uncircumscribed? Or would they understand that it depended upon the evidence, and upon a consideration of it, as directed and admonished by the court, and that they were not justified in making the recommendation, unless there was some evidence in the case when so considered to support or to justify it? We think the latter, and not the former, is the inevitable conclusion. When the court told the jury that they should consider the question of making the recommendation "in the same manner as any other question submitted to you," in what sense or light would the jury ordinarily understand that? How were they required to consider other questions? By considering the issues, the burden, degree and quantum of proof, the effect and weight of evidence, the requirement that facts found must be established and justified by evidence, or that the party having the burden must lose if he has not sustained it by the degree and quantum of proof required by law, etc. The charge not only had the tendency to mislead, but also gave the jury a wrong principle of law. It undoubtedly is the law, that the jury, in the event they found the prisoner guilty of murder in the first degree, had the absolute right to recommend a punishment of life imprisonment, and that the making or withholding the recommendation was a matter entirely within their discretion to be exercised in any manner and for any reason they saw fit, and that they "should be left free to dispose of the question without any intimation of the court as to what should control or influence them in

reaching a conclusion upon it." It is just as clear that the jury were not left free to so dispose of it. The court, in effect, told them that in making or withholding the recommendation they should be controlled by the evidence and the objects of punishment as stated to them by the court. The further question in that connection is that of prejudice. We will look at that later.

The defendant was a witness in his own behalf. He, having testified on direct examination that he entered the store for the purpose of robbery; that he pointed the gun first at Jacobson and then at Fassell; that he "shoved the revolver into him," or "poked him with it;" that he was not familiar with the action of the gun; that he did not intend to shoot or kill any one; and that the gun was accidently discharged—was then asked on cross-examination by the district attorney: "Where did you get that gun?" The defendant answered : "In Salt Lake." The district attorney: "Under what circumstances did you get the gun?" Objections were made to these questions on the ground that they were immaterial and irrelevant. The court, in overruling the objections, stated that the defendant "may decline to testify if he so desires, on the ground that it may incriminate him in any other thing; and the court will instruct him that he may decline, if he so desires, on the ground that it may tend to incriminate him, if in fact it does, in some other affair." Defendant: "I decline to answer." District Attorney: "For what reason?" Defendant: "For the reason that the judge says—what the judge said; it might incriminate me." Court: "It might tend to incriminate you?" Defendant: "Yes, sir." From this it would seem that the court was satisfied that the question propounded called for evidence of an incriminating or degrading character, and that the defendant had the right to claim and had claimed his privilege. The district attorney, however, not satisfied that the claim of privilege had yet sufficiently been made in response to the last question propounded by the court and the answer of the defendant thereto, asked the defendant: "In the commission of some other crime?" De-

fendant: "I say in some other crime or not." District Attorney: "Well, if it tends only to incriminate you in this crime, that is immaterial. If it tends to incriminate you in some other crime, that is the question." Court: "Is that the ground on which you decline? Defendant: "Yes, sir." District Attorney: "That it may tend to incriminate you in some other crime?" Defendant: "Yes, sir." The district attorney passed the question for a time and asked the defendant questions relating to the length of time he owned the gun and his familiarity with it, and then asked him: "Was this the first time you ever went out to commit a crime?" Defendant: "Yes, sir." District Attorney: "First time?" Defendant: "Yes, sir." District Attorney: "Then why do you decline to answer where you got this revolver?" Defendant: "Because it is incriminating to other people, and myself, too." District Attorney: "Is this the first time you committed a crime?" Defendant: "Yes, sir." District Attorney: "Then why don't you tell me how you got that gun?" Defendant: "Because I don't have to answer." District Attorney: "Because it may incriminate you in a crime?" Defendant: "I don't have to answer, that's all." District Attorney: "It may incriminate you or somebody else?" Defendant: "I couldn't say." District Attorney: "Might it incriminate you?" Defendant: "I can't say." District Attorney: "Then I insist upon this witness answering the question." Court: "He said that it would; the court must take that as the statement—that is, that it may." The district attorney, still not satisfied, immediately asked the defendant: "In the commission of a crime? Is that right? Then this crime that you went out to commit on this Saturday night when you held up the Fassell store was not your first crime, was it?" Defendant: "No, sir." District Attorney: "You had gone out on other nights to commit crime, hadn't you? Defendant: "I don't see what that has got to do with this case here." The court finally agreed with him, and sustained the objection.

From this proceeding it would seem that when a witness is asked a question relating to incriminating acts, or calling

for evidence of an incriminating nature, separate and distinct from those on trial and testified to by him, he, when he claims the privilege, must also say he declines to answer on the ground that if he did answer his answer would incriminate him. If the particular answer which he would make would incriminate him, he need not answer. If it would not, he must answer. That is, had the defendant been asked whether at a specified time and place he had not committed another murder or robbery, the court would inform him that if the answer which he might make would incriminate him he could decline to answer the question; if it did not, he must answer it. If he declines to answer he must expressly state that he declines on the ground that if he did answer his answer would incriminate him. That is but the equivalent of admonishing the witness that if he is guilty of the offense or crime suggested by the question, and if in making his answer he would admit it, he could decline to answer. If he was not guilty of the offense or if in making his answer he would not admit it, he must answer. Then with such admonition direct the witness to answer or decline. If he declines, make him state that he does decline on the ground that if he answered he would have to admit his guilt, and keep at him until an unequivocal admission of guilt is obtained from him. And if he is convicted, say he was not prejudiced, because he is a bad man anyway. That, in effect, is what was here done, and what is here claimed. Such notions are violative of the proper rules of cross-examination, and a misconception of the rules of evidence applicable to the privilege of the witness, and render the claim of privilege wholly ineffectual.

The rule obtains in this jurisdiction that a defendant, in a criminal case, becoming a witness, may be cross-examined the same as any other witness. He, like any other witness, may be asked many questions wholly irrelevant and collateral to the issue, for the purpose of testing his memory, affecting his credibility, and the weight of his testimony. When a question is asked which relates to incriminating acts, or calls for evidence of an incrimi-

nating character, separate and distinct from those on trial or testified to by him, he, like any other witness, may claim the privilege and decline to answer it. The prevailing opinion in this country is that it is for the court, and not the witness, to determine whether the evidence called for by the question propounded may or may not tend to incriminate the witness. (*Overend v. Sup. Ct.,* 131 Cal. 280, 63 Pac. 372.) In most instances the question propounded to the witness will, upon its face, disclose whether or not evidence sought in response to it is of a criminating or degrading character. If it is not so made to appear, and the claim of privilege is made, the incriminating nature of the evidence sought should otherwise be made to appear to the court to enable it to make an intelligent and proper ruling. The claim should then be allowed or disallowed by the court, as it may determine whether the evidence sought is or is not incriminating or degrading. *In re Rogers,* 129 Cal. 468, 62 Pac. 47. In the case of *Rogers v. Sup. Ct.,* 145 Cal. 88, 78 Pac. 344, the court said: "Where it is made to appear that such is the nature of the question asked, the court is without power to compel an answer." The purpose of statutes and constitutional provisions granting the privilege or immunity is to protect the witness against compulsory self-accusations. (*Ex parte Cohen,* 104 Cal. 524, 38 Pac. 364, 26 L. R. A. 423, 43 Am. St. Rep. 127.) That does not mean that if a witness is not guilty or is innocent of the offense, or of the incriminating acts, or the degradation, suggested, or attempted to be elicited by the question, he is obliged to answer, and that he can claim the privilege only in the event that he is guilty of them, and that his answer would show his guilt, or tend to show it. When evidence is sought of a witness which in its nature is incriminating or degrading, the witness may claim his privilege by declining to answer, and he is entitled to be protected in his claim without requiring him to also say that if he was compelled to answer his answer would incriminate him. To require that is to hold that the claim of privilege is an acknowledgment of guilt of the degradation or criminating acts, or offense, suggested

by, or involved in, the question. The prevailing opinion, and, we think, the better rule, is, that the fact that the privilege is claimed and is allowed cannot be commented on by counsel, nor considered in any other way as affecting the weight of the testimony given by the witness, nor can any adverse inferences be drawn from it. To say that the claim of privilege and its allowance exposes a witness to such adverse inferences, is to fritter away the right itself which existed at common law, and which has been preserved by, and written into, the Constitution of this country. When evidence of an incriminating or degrading character is sought or attempted to be elicited from the witness, the right is conferred on him to elect whether or not he will permit it to be gone into. If he elects not to do so, and his claim of privilege is sustained, that is the end of the inquiry.

The defendant having testified that he was not familiar with the action of the gun, and for that and other reasons it was unintentionally or accidentally discharged, the question propounded to him on cross-examination, "Where did you get that gun?" was proper and pertinent cross-examination. Such a question might tend to show that he had or possessed the gun longer than as testified to by him, and, in some degree, related to matters already voluntarily testified to by him. The witness answered that question. The other question, "Under what circumstances did you get the gun?" stands on a different footing. It certainly was irrelevant to the issue, or to anything testified to by the defendant. Was it proper to test the memory of the witness, or to affect his credibility, or the weight of his testimony? It clearly had no such tendency, unless in answer to the question it was sought to elicit from the witness some fact or act, or conduct, of an incriminating or degrading character. The court and district attorney so regarded and treated the purpose of the question. The court so regarding it at once informed and admonished the witness of his rights with respect to his claim of privilege. The witness claimed it. The court being satisfied, as he was, that the question called for such

39 Utah—15

evidence, and having allowed the claim of privilege, as he did, ought to have there ended the inquiry. To thereafter allow the district attorney to repeatedly ask the witness and to compel him to state that to answer the question would incriminate him "in the commission of another crime," and to then ask and compel him to answer that because he had claimed the privilege and was allowed it, the crime of which he was charged was not his first crime, was to convert the claim of privilege as one of protection against compulsory self-accusations, into self-accusations and an acknowledgment of guilt, and was therefore improper. Furthermore, the question, "Under what circumstances did you get the gun?" was not only irrelevant to the issue and to anything testified to by the defendant, but was also irrelevant to the question affecting credibility. Under the authorities, generally, a witness, to affect credibility, may be asked if he had not been convicted of a crime. Such a question is not privileged, and the witness must answer. Under some authorities, he may also be asked if he had not committed a crime. Such a question is privileged, and the witness may decline to answer it. If he does, that is the end of it. If he elects not to claim the privilege, and answers it, that also is the end of it. Being collateral and irrelevant to the issue, the witness may not be contradicted nor impeached with respect to his answer. But we think the prevailing rule is—though the authorities are not by any means harmonious—that for the purpose only of affecting credibility, the witness may not properly be asked questions relating to mere specific acts or conduct of a wrongful, culpable, or even incriminating character, not amounting to the commission of a crime, and which are separate and distinct from those on trial and not already voluntarily testified to by the witness. This is upon the theory that to permit it opens the door to mere collateral matters which to investigate and determine may require as much time as to investigate and determine the issue itself, compels the witness to defend himself in respect of transactions without notice or preparation, and tends to detract the attention of the jury from the real issues. Hence

questions of that kind are regarded, not only as being irrelevant to the issue, but also as being irrelevant to affect credibility; that is, to ask a witness if he had not committed burglary or murder, though irrelevant to the issue, is nevertheless relevant as affecting credibility. But to ask him if he did not, at an unusual hour of the night, leave a private dwelling with a mask on his face, a gun in his hand, and a bundle under his arm, or if he, at a specified time and place had not shot and killed a man, if not relevant to the issue, is also not relevant to affect credibility. If the witness elects not to claim his privilege, and answers that he did, or did not, commit burglary, or murder, that is the end of the inquiry. If he admits the commision of the crime, there is nothing left to explain, or further to be inquired about. If, on the other hand, he admits the facts stated with respect to leaving the dwelling, or that he shot and killed a man, he may, in explanation, show that the one, though apparently suspicious, was nevertheless innocent, or that the other was so clearly accidental or justifiable that he was not even arrested for it. To do that would inconveniently and unnecessarily engage the time and attention of the court and jury in the investigation and determination of a transaction wholly collateral to the issue. This was the situation with respect to the question propounded by the district attorney, "Under what circumstances did you get the gun?" It is conceded that it was irrelevant to the issue. The only purpose claimed for it is to affect credibility. By such question the door was attempted to be opened to inquire into and to investigate "the circumstances" of a transaction wholly irrelevant and collateral to the issue for the purpose only of affecting credibility. The authorities generally do not permit that. We think the objection to the question that it was irrelevant and immaterial ought to have been sustained.

We also think these rulings, and the erroneous charge heretofore considered, were harmful. If the only question to be determined by the jury had been the guilt or innocence of the defendant, it might well be said that no prejudice resulted, because, on the evidence alone

of the defendant, and upon the undisputed evidence in the
case, he is shown guilty of murder in the first degree. But
the jury had another duty to perform—the one with respect
to the making or withholding a recommendation of punish-
ment. Upon the verdict of a conviction of first degree mur-
der without the recommendation, the court was bound to
pronounce, as it did, a judgment inflicting the death penalty.
With the recommendation, a discretion was conferred upon
the court to impose a punishment of life imprisonment.
Upon the record it is apparent that the only defense made by
the defendant was to obtain the recommendation from the
jury, and to save his life. He was entitled to go before
the jury, as in effect he did, admitted his guilt of first de-
gree murder, and seeking a recommendation of life im-
prisonment at their hands. He failed to obtain it. A ver-
dict of first degree murder was rendered without the recom-
mendation. The question now is, Did the erroneous rulings
referred to influence or affect the result of the jury in not
making the recommendation? Such rulings undoubtedly had
a tendency to influence or induce just such a result. What
the result with respect to the recommendation would have
been had the jury been left free to dispose of the question
without any intimation from the court as to what should
control or influence them in reaching a conclusion upon it,
and had they been told, as the court should have done, that
the making or withholding the recommendation was a mat-
ter entirely within their discretion to be exercised in any
manner they saw fit, can only be conjectured. The erro-
neous rulings, whereby evidence was improperly elicited
from the defendant that because of his claim and allowance
of privilege, the offense on trial was not the first crime com-
mitted by him, had a direct bearing on the question of the
recommendation, and not only tended to, but very likely did,
influence the jury in reaching the conclusion not to make
the recommendation. We therefore think the rulings not
only erroneous, but prejudicial.

It is further contended that a new trial ought to have been
granted on the ground of the separation of the jury and the

misconduct of one of its members. The defendant, in support of his motion, showed that after the case was finally submitted to the jury, and before they had concluded their deliberations, and while they, in charge of two officers, were at lunch at a public hotel and seated at the lunch table, one of the jurors with one of the officers went into another part of the building where the juror talked to some one over the telephone. These facts were not disputed. The state offered no evidence to dispute them, nor did it attempt to show what the conversation over the telephone was, or with whom it was held, or that it was harmless, and could not have influenced or affected the deliberations of the juror or his verdict. The state, in effect, urges that injury or prejudice may not be presumed from the unexplained communication, and to sustain his claim of prejudice the defendant was required to show that some harmful information was communicated to the juror which tended to influence or affect his deliberations and verdict, or circumstances from which it could be inferred, and until such proof was made the state was not required to show the contrary. That rule might well be applied to communications between a juror and a person having no interest in the litigation, which were authorized and not forbidden. It may be presumed that a juror, who, pending the trial or after the retirement of the jury to consider their verdict, and not forbidden to do so, communicates with one, a stranger to, and not interested in, the litigation, communicated about something not related to the case or the parties. An unexplained communication under such circumstances would not amount to misconduct, unless the circumstances attending it were such as to induce an inference of some wrongful or improper conduct. In such case a presumption of prejudice should not be indulged from an unexplained communication even though from the attending circumstances it may be said that the conduct with respect to it was of doubtful propriety. But here the communication had, under the circumstances disclosed, was unauthorized and forbidden. If it was necessary for the juror to communicate with some one

over the telephone or otherwise, the matter should have been called to the attention of the court who could have granted or refused the permission as the exigencies of the case required. To hold such private communications, under the circumstances, apart from and in the absence of his fellow jurors, and without the court's permission, certainly was misconduct. Such conduct cannot be tolerated and the purity of the jury maintained. To permit it and to excuse it as to one juror requires a permission of it to others. To do that is to allow members of the jury to be brought in contact with outsiders, and to afford them an opportunity to hold prejudicial communications about the case, or at least to expose them to such harmful and prejudicial influences. The juror here by his misconduct exposed himself to such influences. What the juror said over the telephone, or what was said to him, is not made to appear. Had his conduct in such particular not been misconduct, perhaps the presumption might be indulged that what was said by him or communicated to him was entirely personal to him and unrelated to the case until the contrary was made to appear. But he did something which he was unauthorized and forbidden to do. He was a contemner and a wrongdoer. From the conduct disclosed and the exposure of the juror to harmful influences, prejudice is presumed, and the burden cast on the state to show what the communication was, and that it was harmless and could not have influenced or affected the deliberations of the juror or his verdict. (*Sallzman v. Sunset Tel., etc., Co.,* 125 Cal. 501, 58 Pac. 169; *State v. Cotts,* 49 W. Va. 615, 39 S. E. 605, 55 L. R. A. 176; *Hempton v. State,* 111 Wis. 127, 86 N. W. 596; *Gandy v. State,* 24 Neb. 716, 40 N. W. 302; *Tarkington v. State,* 72 Miss. 731, 17 South. 768; *Robinson v. Donehoo,* 97 Ga. 702, 25 S. E. 491.)

And generally in cases where it was held that the misconduct of a juror engaging in unauthorized communications with others was not prejudicial, and did not vitiate the verdict, it was affirmatively and clearly made to appear what the conversation or communication was, and that it was

entirely harmless, and unrelated to the case, or, in case of a separation, that the circumstances were such that the juror was not, and could not have been, exposed to prejudicial or harmful influences by reason of the separation. The court in the case of *Hempton v. State, supra,* while stating that "the courts have gone a great way in sustaining verdicts, even in capital cases, notwithstanding misconduct, upon a satisfactory affirmative showing that their impartiality and the result of their labors were not affected thereby," also observed that "there seems to be a growing tendency to looseness in the management of juries in important cases which calls loudly for a check if not for a substantial reform, if judicial administration is to be kept above suspicion as regards weighing out justice with the highest attainable degree of certainty." To obtain the free and dispassionate judgment of jurors in the trial of capital cases, long experience has demonstrated the necessity of preventing the jury from mingling or conversing with the people, and of keeping them secluded from all outside influences calculated to interfere with or affect their impartiality or judgment. These safeguards were at common law deemed essential to the right itself of trial by jury. That right with its ancient safeguards has been preserved in this country by Constitutions and statutes. An infraction of it calculated to impair the right cannot properly receive the sanction of the court without doing violence to such constitutional and statutory provisions. If it should be thought that they no longer serve a useful purpose, let them be abolished and taken out of the Constitution and statute and others substituted in their place. As long as they remain, it is the duty of the courts to see that they are observed and obeyed. After a final submission of a case to a jury, and before reaching a conclusion as to their verdict, to permit a juror without the court's permission to leave his fellow jurors and go to another portion of the building and there engage in a private conversation over the telephone is a practice not to be tolerated, if these constitutional and statutory provisions are to be observed and given effect. He might as well be permitted to leave them,

and to go on the street, or to his office, and there engage
with some one in conversation. To say that the accused can-
not sustain his claim of prejudice until he also shows that
the juror talked about something harmful to the accused's
rights is to fritter away the constitutional and statutory pro-
visions requiring the jury to be kept secluded from all out-
side influences. It is enough that the state, to sustain the
verdict against the accused under such circumstances, is per-
mitted to show that the conduct, though wrongful and in
disobedience of the statute and the directions of the court,
nevertheless was harmless, by showing all that was said and
done, and by clearly and affirmatively showing that the ac-
cused was not, nor could have been, prejudiced thereby.
The state not having done this, is not entitled to hold the
verdict.

A pair of overalls, a hat and handkerchief worn by the
defendant, and the gun used by him, on the night of the
robbery and homicide, were put in evidence by the state.
When the defendant was on the witness stand and being
cross-examined, he, at the request of the district attorney, and
against the objections of counsel for the accused, was com-
pelled to put on the overalls and the hat, tie the handker-
chief about his face, take the gun in his hand, and show
his appearance on the night in question. The objections to
such proceedings having been overruled, the district attor-
ney said to the defendant. "Put on the overalls. Now tie
this handkerchief over your face the way you had it tied
that night. Now put on this hat the way you wore it that
night. Now take this gun and hold it as you held it that
night as you entered the store. Carry the gun cocked in
your hand. Did you hold it that way?" Defendant: "Yes,
sir." District Attorney: "Now indicate how you went up to
Jacobson by pointing it at me. How did you point the gun
at him?" Defendant: "Just like that." District Attorney:
"That is the appearance, now, you made in the store, with
the exception of the coat, which is a different coat?" De-
fendant: "Yes." The defendant having testified that the
gun was unintentionally discharged, could, as proper cross-

examination, have been required to take the gun and show how he used it and handled it on the occasion in question. But we have looked the record in vain for any useful or proper purpose in compelling the defendant to garb himself as a highwayman and to exhibit himself before the jury as a desperado and after he had been placed in the required attitude to say to him, and compel him to answer, "That is the appearance you made?" on the night in question. It is not made to appear that such portion of the proceeding was illustrative or explanatory of any disputed fact or question in the case. No fact or question is pointed to or referred to which such a proceeding would tend to illustrate or explain. It seems to have been conducted for the purpose only of showing to the jury how the defendant garbed as a highwayman looked and appeared on the night in question. The proceeding conducted for such purpose tended to disturb and arouse to passion the calm and dispassionate minds of inexperienced laymen sitting as jurors, and was improper. We therefore need not inquire into the power of the court to require a defendant against his will to so array and exhibit himself before the jury.

The judgment of the court below is reversed, and the cause remanded for a new trial.

McCARTY, J., concurs.

FRICK, C. J. (concurring).

I concur in the reversal of the judgment for the following reasons: (1) That there was error in the charge of the court upon the question relative to the recommendation of what punishment the appellant should suffer; (2) that the cross-examination of the defendant in certain respects was improper; (3) that the juror who used the telephone was guilty of misconduct; and (4) because the defendant was unnecessarily, and without cause, required to put on the clothes, including the mask, etc., that he wore on the night of the homicide. I, however, concur in the reversal of the judgment only because the defendant may have been, and in all

probability was, prejudiced in his rights of having a jury which was entirely free from bias and prejudice pass upon the question of what his punishment should be. I desire to state, however, that if the only error complained of was the one relating to the giving of the charge concerning the recommendation, I should not, in view of all the facts and circumstances of the case, concur in a reversal of the judgment upon that cause alone. In view, however, of the whole record I am convinced that the appellant was prejudiced in a substantial right for the reasons set forth in the opinion of Mr. Justice Straup. Moreover, under the rule laid down in the case of *State v. Shockley,* 29 Utah 25, 80 Pac. 865, 110 Am. St. Rep. 639, which case was followed in *State v. Vance,* 38 Utah 1, 110 Pac. 434, it seems to me there is no escape from the conclusion that the cross-examination of the defendant with respect to whether he should or should not be required to answer certain questions constituted an invasion of a substantial right and was prejudicial. So long as prosecuting officers will disregard the rights of an accused and in doing so prevent him from having a fair and impartial trial upon all questions in issue, and upon all questions involving a substantial right, just so long we are bound, as the reviewing court, to interfere with judgments.

I am of the opinion, however, that the defendant was properly convicted of murder in the first degree, and that were it not for the question of his recommendation the verdict of the jury finding him guilty should not be disturbed. This, in my judgment, is so because the statements of the defendant while testifying as a witness in his own behalf left no room for any possible doubt of his guilt of murder in the first degree.

The alleged misconduct of the juror could not have prejudicially affected the defendant so far as the finding of guilty is concerned, but the juror's misconduct may have influenced him upon the question of recommendation, and for that reason I think the judgment sentencing the defendant to suffer death should be reversed.

I do not unqualifiedly concur in Mr. Justice Straup's apparent conclusion that if it had not been for defendant's testimony the court's instruction with regard to what facts were necessary to convict the defendant of murder in the first degree would be erroneous upon the ground that the instruction, in legal effect, was a departure from the charge laid in the information. I think that under the great weight of authority the charge referred to is a proper one to give in any case where the information is couched in the language set forth in Mr. Justice Straup's opinion, and the evidence at the trial is confined to a homicide which was committed while the accused was in the act of committing a felony, included within the statute defining murder in the first degree. While I am of the opinion that the several matters discussed by Mr. Justice Straup constituted error prejudicial to the substantial rights of the defendant, yet, in my opinion, all of them were prejudicial only upon the one question namely, that the defendant was prevented from having the fair and impartial judgment of the jury upon the question of the recommendation of the degree of punishment he should suffer. Upon the question of guilt the defendant's own statements require a verdict of guilty of murder in the first degree, but those statements, in the judgment of a fair and impartial jury, may not call for a sentence of death. Upon that question alone the defendant has not had a fair and impartial trial.

The judgment, therefore, should be reversed.